IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA FERGUSON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE GREAT ATLANTIC & PACIFIC | : | |
| TEA CO., INC., ET AL. | : | NO. 13-778 |

<u>MEMORANDUM</u>

**Padova, J.**                                                               **December 16, 2013**

Plaintiff Barbara Ferguson was injured when she tripped over a box that was being used to prop open an office door at a Pathmark supermarket.   She brought this negligence action against Defendants The Great Atlantic & Pacific Tea Co., Inc. and Pathmark Stores, Inc., alleging that Defendants had created and maintained a dangerous condition.   On July 17, 2013, a jury returned a verdict in favor of Ms. Ferguson and found her to have suffered $834,703.33 in damages. Defendants have now filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, a Motion for Post-Trial Relief in the form of a New Trial or Remittitur.   For the following reasons, we deny the Motion in its entirety.

## I.  BACKGROUND

On January 24, 2011, Ms. Ferguson, who was 68 years old, visited a Pathmark supermarket in her capacity as a sales representative for General Mills.   (N.T. 7/16/13 at 47-49.)   In the course of her work that day, she went to a back office of the Pathmark store, called the "scan office."   (<u>Id.</u> at 49.)   The door of the scan office was propped open with a white printer paper box, which was filled with white paper.[1]   (<u>Id.</u> at 102-04, 114-115; <u>see also</u> Trial Ex. P-2.)   When Ms. Ferguson exited the office after conducting her business there, her left leg hit the box and she fell to the

---

[1] Although the record does not appear to contain the precise dimensions of the box, Defendants state in their Motion that the box "was approximately 1' x 1 ½' wide and approximately 1' high."   (Defs.' Mot. ¶ 12.)

ground.   (N.T. 7/16/13 at 52-53.)   She fractured her shoulder in four places and also fractured her

kneecap.   (Bonner Dep. Tr. at 15-16, 24.)   She subsequently had major surgery on her shoulder.

(Id. at 16-17.)   As a result of her injuries from the fall, Ms. Ferguson can no longer work or drive,

and she continues to suffer from persistent pain in her shoulder.   (Id. at 15, 23, 28.)

The jury returned a verdict in favor of Ms. Ferguson on her negligence claim.   It found

Defendants to be 95% causally negligent and Ms. Ferguson to be 5% causally negligent.   The jury

further found the dollar amount of Ms. Ferguson's damage to be $834,703.33.   We molded the

verdict to account for the parties' relative causal negligence, and entered judgment in Ms.

Ferguson's favor in the amount of $792,968.16.   Defendants previously moved for judgment as a

matter of law at the close of the Plaintiff's evidence and moved again at the end of the trial, and

they now move pursuant to Federal Rule of Civil Procedure 50(b) for judgment as a matter of law

or, in the alternative, for either a new trial or remittitur pursuant to Federal Rule of Civil Procedure

59.

## II.      LEGAL STANDARD

Federal Rule of Civil Procedure 50(b) governs the renewal of a motion for judgment as a

matter of law.   Fed. R. Civ. P. 50(b).   It provides in pertinent part as follows:

> No later than 28 days after the entry of judgment . . . the movant may file a
> renewed motion for judgment as a matter of law and may include an
> alternative . . . request for a new trial under Rule 59.   In ruling on a
> renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

Id.   The United States Court of Appeals for the Third Circuit has instructed that "judgment as a

matter of law should be granted sparingly." Eshelman v. Agere Systems, Inc., 554 F.3d 426, 433 (3d Cir. 2009).   Indeed, we are to grant a Rule 50(b) motion "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference," we find that "there is insufficient evidence from which a jury reasonably could find liability." Fowler v. UPMC Shadyside, 578 F.3d 203, 213 n.8 (3d Cir. 2009).   Evidence is insufficient for this purpose "where 'the record is critically deficient of the minimum quantum of evidence' in support of the verdict." Eshelman, 554 F.3d at 433 (quoting Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083 (3d Cir. 1995)).   "In determining whether the evidence is sufficient to sustain liability, [we] may not weigh the evidence, determine the credibility of witnesses, or substitute [our] version of the facts for the jury's version." Fowler, 587 F.3d at 213 n.8 (citing Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 190 (3d Cir. 1992)).

Federal Rule of Civil Procedure 59 governs motions for new trials.   Fed. R. Civ. P. 59.   It provides, in relevant part, as follows:

> The court may, on motion, grant a new trial on all or some of the issues – and to any party – as follows:
>
> (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .

Fed. R. Civ. P. 59(a)(1).   Pursuant to this rule, we may, "in the exercise of discretion, . . . grant a new trial if, *inter alia*, the jury's verdict was against the weight of the evidence, or if substantial errors occurred in the admission or exclusion of evidence or in the charge to the jury.'" Shrey v. Kontz, Civ. A. No. 10-1420, 2013 WL 5961092, at *12 (M.D. Pa. Nov. 7, 2013) (quoting Kidd v. Commonwealth of Pa., Bureau of Liquor Control Enforcement, Civ. A. No. 97-5577, 2001 WL 1159770, at *1 (E.D. Pa. Aug 21, 2001)).   Our "latitude in ruling on [a] motion [for a new trial] is

especially broad when the grounds asserted in the motion concern matters that initially rested within [our] discretion." Jacobson ex rel. Jacobson v. BMW of N. America, LLC, 376 F. App'x 261, 264 (3d Cir. 2010) (citing Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993)). "When the basis for the motion is an alleged error on the part of the court, such as an error in jury instructions or evidentiary rulings, [we] must first determine whether an error was made, i.e., 'whether, taken as a whole, the instruction properly apprised the jury of the issues and the applicable law.'" Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., Civ. A. No. 09-290, 2013 WL 5332108, at *15 (W.D. Pa. Sept. 23, 2013) (quoting Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 78 (3d Cir. 2009)). "If there was an error, the court must then determine 'whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice.'" Id. (quoting Bhaya v. Westinghouse Elec. Corp., 709 F. Supp. 600, 601 (E.D. Pa. 1989)).

Our discretion to grant a new trial is more limited when the asserted ground is that the verdict is against the weight of the evidence. In that instance, we may only grant a new trial "'when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" Grazier ex rel. White v. City of Philadelphia, 328 F.3d 120, 128 (3d Cir. 2003) (quoting Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991)). Moreover, where, as here, "the subject matter of the litigation is simple and within a layman's understanding, [we are] given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations . . . ." Williamson, 926 F.2d at 1352. In reviewing a motion for a new trial, we must "view[] the record evidence in the light most favorable to . . . the verdict winner, and draw[] all reasonable inferences

4

in his favor."   <u>Pitts v. Delaware</u>, 646 F.3d 151, 155 (3d Cir. 2011).

## III.   DISCUSSION

In seeking both judgment notwithstanding the verdict pursuant to Rule 50 and a new trial pursuant to Rule 59, Defendants argue that the evidence at trial was legally insufficient to support a finding that they were negligent and that, even if it were sufficient to support a negligence finding, the evidence was not sufficient to support a finding that Ms. Ferguson herself was less than 51% negligent.   Defendants also seek a new trial pursuant to Rule 59 on the grounds that (1) we erred in admitting certain expert testimony, and (2) the jury instruction regarding the duty a possessor of land owes to invitees was confusing.   Finally, Defendants seek remittitur pursuant to Rule 59(e).   We reject all of these arguments.

A.   <u>Sufficiency of the Evidence</u>

1.   <u>Defendants' negligence</u>

Defendants argue that they are entitled to judgment notwithstanding the verdict or a new trial because the trial evidence unequivocally established that the box on which Ms. Ferguson tripped was a "known and obvious" danger and, under Pennsylvania law, a defendant cannot be found negligent for a danger that is "known and obvious."   However, Defendants' argument not only ignores the record evidence that supports a reasonable conclusion that the box on which Ms. Ferguson tripped was not "known and obvious," but is also grounded on a misstatement of Pennsylvania law, which, under certain circumstances, imposes liability even where a danger is known and obvious.

Under Pennsylvania law concerning business visitors, "possessors of land owe a duty to protect invitees from foreseeable harm."   <u>Carrender v. Fitterer</u>, 469 A.2d 120, 123 (Pa. 1983)

(citation omitted).   A possessor of land is subject to liability to a visitor if he (1) knows or has reason to know that a condition on the land poses an unreasonable risk of harm to invitees, (2) should expect that visitors will not discover or realize the danger, or will fail to protect themselves against the danger, and (3) fails to exercise reasonable care to protect visitors from the danger.   Id. (citing Restatement (Second) of Torts § 343).   As a corollary to this rule of liability, "'[a] possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them unless the possessor should anticipate the harm despite such knowledge or obviousness.'"   Id. at 124 (quoting Restatement (Second) of Torts § 343A) (additional citations omitted).   "A danger is deemed to be 'obvious' when 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence and judgment.'"   Id. at 123-24 (quoting Restatement (Second) of Torts § 343A cmt. b).   "For a danger to be 'known,' it must 'not only be known to exist, but . . . also be recognized that it is dangerous and the probability and gravity of the threatened harm must be appreciated.'"[2]   Id. at 124 (alteration in original) (quoting Restatement (Second) of Torts § 343A cmt. b).

Here, Defendants argue that the dangerous condition that the box created was "obvious" because the box was in plain sight, and was not hidden around a corner, covered or concealed. They rely on evidence admitted at trial that Ms. Ferguson had to travel approximately fifteen feet down a straight hallway to reach the scan office; that the box was on the floor and "jutted out" into the hall; and that Ms. Ferguson had no difficulty entering the scan office.    (Defs.' Mot. ¶ 49.) Defendants ignore, however, the ample evidence at trial from which a jury could conclude that the

---

[2]   We instructed the jury at trial as to these definitions of "known" and "obvious."   (N.T. 7/17/13 at 24.)

dangerous condition created by the box was not "known and obvious."  Not only did Ms. Ferguson testify that she did not see the box on her way into the pricing office (N.T. 7/16/13 at 49), but, in addition, there was evidence that there was a lack of color contrast between the box and the floor, because both were white.  (N.T. 7/15/13 at 51; N.T. 7/16/13 at 114-15.)  Indeed, the photographs on which Defendants relied at trial made clear that the white box was camouflaged by the white flooring.  (See, e.g., Trial Ex. P2.)  Furthermore, as is apparent from the photographs, the box was well below eye level and intruded upon the walkway from the office into the hallway. (See id.)  Accordingly, viewing the evidence and inferences in the light most favorable to Ms. Ferguson, we find that the jury could have reasonably concluded that neither the box nor the risk it posed would be apparent to, and recognized by, a reasonable visitor exercising normal perception, intelligence and judgment.   The jury also could have reasonably concluded that Ms. Ferguson did not know that any danger existed.   Thus, the jury could have reasonably concluded that the danger that the box posed was neither known nor obvious, and we reject Defendants' assertions to the contrary.

Moreover, even assuming for the sake of argument that the only reasonable conclusion that a jury could have drawn from the trial evidence was that the dangerous condition was "known and obvious," we reject Defendants' argument that they could not be found liable for that known and obvious condition.   As the Pennsylvania Supreme Court made clear in Carrender, a "'possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness."  469 A.2d at 124 (quoting Restatement (Second) of Torts § 343A) (emphasis added); see also Pa. Suggested Standard Jury Instructions (Civil) §

18.40 ("An [owner][occupier] of land is liable to invitees for any harm that the [owner][occupier] should have anticipated, regardless of whether the danger is known or obvious."). Thus, the law is clear that a possessor of land will be liable to invitees for known and obvious dangers if it should have anticipated the harm in spite of the known and obvious nature of the danger. Here, Defendants ignore that they may be liable for a known or obvious condition if they should have anticipated the harm, and thus do not address whether there is evidence on the record regarding whether they should have anticipated Ms. Ferguson's harm. Accordingly, even if no reasonable jury could have concluded that the danger was not known and obvious, Defendants have not established that they should be relieved of liability under Pennsylvania law.

For the above reasons, we deny Defendants' Motion to the extent that it seeks judgment notwithstanding the verdict or a new trial on the ground that the box was a known and obvious danger.

### 2.   Ms. Ferguson's comparative negligence

Defendants argue that, even if the evidence was sufficient to support a finding that they were negligent, they are entitled to judgment notwithstanding the verdict or a new trial because the evidence does not support the jury's conclusion that Ms. Ferguson herself was less than 51% negligent. According to Defendants, the evidence at trial demonstrated that Ms. Ferguson's "own negligence was the sole cause of her injuries." (Defs.' Mot. ¶ 62.) However, Defendants ignore the significant trial evidence that supports the jury's conclusions that Defendants were 95% causally negligent and that Ms. Ferguson's causal negligence was just 5%.

Among the evidence on which the jury could have reasonably based its conclusion regarding Defendants' causal negligence is the following. The manager of the Pathmark store,

Joseph Dougherty, testified at trial that, upon assuming a management role at Pathmark, he received no specific fall prevention training.   (N.T. 7/15/13 at 35.)   He also testified that the store in which Ms. Ferguson fell was supposed to have a safety committee, but did not.   (Id. at 35-36.) Mr. Dougherty nevertheless understood that a box placed on a floor in a walkway could be a tripping hazard, and that aisles and walkways in the store should therefore be free of obstacles and clutter.   (Id. at 25-26.)   At the same time, Mr. Dougherty knew that it was common practice for store employees to use a box to prop open the door of the scan office.   (Id. at 27.)   He rationalized this practice by explaining that the door's automatic closing device would cause the door to swing shut and lock if it was not propped open, and that the store had a limited number of keys that could open the door, so that propping open the door was simply more convenient.   (Id. at 27.)   On the other hand, Mr. Dougherty admitted that Defendants could have held the door open with small rubber door stopper, which they could have purchased from a store such as Home Depot or Lowe's.   (Id. at 33.)

In contrast, there was little evidence at trial on which to assess causal negligence against Ms. Ferguson.   Among other things, Ms. Ferguson testified that this was the first time that she had been in this particular Pathmark store, and she denied that she was working on her "handheld" rather than looking where she was going when she was walking out of the scan office.   (N.T. 7/16/13 at 76, 79.)   Defendants insist that Ms. Ferguson either saw the box upon entering the scan office, because the approach to that office was a fifteen-foot straight hallway, or was negligent in failing to see the box.   However, Ms. Ferguson testified that she did not notice the box (id. at 49), and the jury could have reasonably found that Ms. Ferguson was not negligent in failing to see the box given its low height and white color against the white flooring.

9

Viewing the evidence and inferences in the light most favorable to Ms. Ferguson, we conclude that Defendants have failed to establish that the evidence did not support the jury's determination that Ms. Ferguson was less than 51% negligent or that this determination was against the weight of the evidence.   We further conclude that Defendants have failed to establish that "the record is critically deficient of the minimum quantum of evidence' in support of the verdict," Eshelman, 554 F.3d at 433 (quotation omitted), that "'the jury's verdict resulted in a miscarriage of justice,'" or that "the verdict . . . cries out to be overturned or shocks our conscience."   Grazier, 328 F.3d at 128 (quotation omitted).   Consequently, we deny Defendants' Motion insofar as it requests judgment in its favor or a new trial due to the alleged insufficiency of the evidence concerning the extent of Ms. Ferguson's negligence.

B.      Expert Testimony

Defendants argue that they are entitled to a new trial pursuant to Rule 59 because we erroneously permitted Mr. Alex Balian, Plaintiff's retail safety expert, to offer opinions regarding the danger posed by the box at issue, and to testify regarding "acceptable" standards in the retail industry.   In their view, this testimony violated a July 11, 2013 pretrial order we issued that limited the scope of Mr. Balian's testimony, and was also inadmissible as both unreliable and unnecessary.

1.      Background

Prior to trial, Mr. Balian prepared two expert reports in which he opined that the box on which Ms. Ferguson fell was a "tripping hazard" because it obstructed the pathway out of the scan office and because it was "low profile."   Defendants filed a pre-trial Motion in Limine, seeking to preclude Mr. Balian's report and testimony pursuant to Federal Rule of Evidence 702 and Daubert

v. Merrell Dow Pharm. Inc., 509 U.S. 579 (1993).   We granted the Motion in part and denied it in part in a July 11, 2013 Order.   Specifically, we denied the Motion insofar as it sought to prohibit Mr. Balian from testifying regarding safety studies and standards of care in the supermarket industry, but granted it insofar as it sought to preclude him from opining that the box on which Ms. Ferguson fell was a "tripping hazard."   (7/11/13 Order at 1.)   We explained in a footnote that Mr. Balian's opinion that the box was a tripping hazard because it obstructed the doorway was unnecessary because the jury could use its own common sense and common experience to determine whether the box obstructed the doorway.   (Id. at 2 n.1.)   We further explained that Mr. Balian's opinion that the box was a tripping hazard because it was a low profile object was inadmissible because his expert report disclosed no identifiable methodology that he had utilized in reaching and rendering that opinion.   (Id.)

On July 12, 2013, the parties took Mr. Balian's deposition by video to be played at trial. During the deposition, defense counsel objected to several questions, contending that Plaintiff's counsel was eliciting testimony that violated the terms of our July 11, 2013 Order.   Defendants brought these objections to our attention before Plaintiff's counsel played the video deposition for the jury.   As a result, we ruled on the objections and, when Plaintiff's counsel played Mr. Balian's videotaped testimony for the jury, he included only portions that we had found to be permissible under our Order.[3]

---

[3] Neither Defendants nor Ms. Ferguson have submitted an accurate recitation of the testimony that was played for the jury.   Most notably, although our review of the audio recording of the trial establishes that the following excerpt was not played, they both mistakenly believe that it was:

> Well, the term "low profile," basically, and I said earlier, anything below your knees is the general rule. . . .   Customers, when they don't expect to have anything in the aisle at that level, that becomes

Mr. Balian testified in pertinent part at trial that the "number one" cause of injury in the supermarket industry are falls after slipping or tripping.  (Balian Dep. Tr. at 23.)   According to Mr. Balian, the consensus in the supermarket industry is that walkways and pathways should be "kept free and clear of any obstruction" in order to prevent trips and falls.  (Id. at 25.)   Mr. Balian testified that it is understood in the industry that trips are caused by protruding objects that are "below the line of sight" and unexpected in a pathway.  (Id. at 24.)   Mr. Balian further testified that the "rule of thumb" in the industry is that anything that is "below the knee" is "below eye level."  (Id. at 28.)   As shorthand, he referred to objects that met this criteria as "low-profile objects."  (Id.)   Mr. Balian also testified that there is neither a consensus nor a school of thought in the retail or supermarket industry that placing a low profile obstacle in a walkway, and expecting customers or invitees to see the obstacle, is an "acceptable" way to prevent trips and falls.  (Id. at 37-38.)

2.   <u>Admissibility of testimony</u>

Defendants contend that Mr. Balian's testimony violated the restrictions that we imposed in our pretrial Order insofar as he testified that the box at issue was a tripping hazard and expressed opinions as to "acceptable" standards in the retail industry.   They also argue that the testimony was inadmissible because it was unreliable and unnecessary.   We reject these arguments.

First, contrary to Defendants' assertion, and consistent with our Order, we did not permit Plaintiff to play any testimony by Mr. Balian offering the opinion that the box at issue was a

---

low profile.   And if you want an actual general guideline, below your knees. . . .   But when you're in the marketplace, that's not an expectation.   So, consequently, these items that I mentioned, since there are not expectations, can be low profile and can be overlooked.

(Balian Dep. Tr. at 32-33.)

"tripping hazard."   Defendants maintain that Mr. Balian testified that "a box like the one at issue in this case could qualify as a low-profile object and, thus, a tripping hazard" (Defs.' Mem. at 9), but, in fact, no such testimony was shown to the jury.   Indeed, at no time during the portion of Mr. Balian's testimony that was played for the jury did Mr. Balian testify that the box at issue was low profile or did he use the phrase "tripping hazard."[4]   We therefore find no merit in Defendants' assertion that we permitted Ms. Ferguson to violate the terms of our Order by presenting testimony from Mr. Balian that the box at issue was a "tripping hazard."

Second, Defendants are simply incorrect in their contention that Mr. Balian's testimony violated the terms of our pretrial Order insofar as he testified that Defendants' conduct was not an "acceptable" standard in the retail industry.   (Defs.' Mem. at 9.)   In connection with this contention, Defendants focus on the following questions and answers that were played for the jury at trial:

> Q:  Mr. Balian, when it comes to industry standards, can you tell us, is there any consensus in the retail store industry or supermarket industry that an acceptable measure for preventing trips and falls is for a retail store to place a low profile obstacle in a walkway and then to simply rely or assume that workers or customers will see it and, therefore, not trip over the hazard?
>
> A.  Not that I'm aware of, no.
>
> Q:  Have you ever heard of such a standard or consensus in the industry?

---

[4]  In one portion of Mr. Balian's deposition that was played for the jury, Plaintiff's counsel used the phrase "tripping hazard."  (Balian Dep. Tr. at 30-31 ("Mr. Balian, you mentioned a couple of times low profile objects.  And I think at one point, you referred to below the knee. Why is that issue important when it comes to objects that can be tripping hazards in retail stores?").)  However, Mr. Balian's answer to that question was not played for the jury.  Rather, the jury heard defense counsel's videotaped objection to the question, then the videotape was paused, and the videotaped deposition resumed at page 37, line 22, with a new question from Ms. Ferguson's counsel.

A:   I have not, no.

Q: Are you aware of any school of thought, in the retail store industry or the government agencies that police that industry, that a store or company's placing a low profile obstacle in a walkway and then relying on a worker or customer or any pedestrian simply to see it is an acceptable way to prevent falls?

A:   I have never heard of anything of that nature, no.

(Balian Tr. Dep. at 37-38.)   According to Defendants, this testimony was couched as fact testimony regarding industry standards, but actually amounted to impermissible opinion testimony that Defendants were negligent, in violation of our July 11, 2013 Order.   However, this testimony is nothing more than industry standards testimony, which we explicitly permitted in our July 11, 2013 Order.   We therefore find Defendants' argument that admission of this testimony violated our pretrial order limiting Mr. Balian's testimony to be meritless.

We also reject Defendants' contentions that we erred in permitting Ms. Ferguson to play for the jury Mr. Balian's video deposition testimony that (1) industry standards recognize that low profile objects, in general, can cause trips and falls, and (2) it is not an acceptable practice in the industry to place a low profile object in a walkway and to expect visitors to see it.   Defendants essentially assert that the former testimony violates Federal Rule of Evidence 702 and <u>Daubert</u> because it is speculative and not based on any methodology, and that the latter testimony impermissibly expressed an opinion as to Defendant's negligence.   However, we conclude that we did not err in permitting Mr. Balian to testify that, in the supermarket industry, there is an understanding that low profile objects can cause trip and falls.   This testimony is neither speculative nor based on insufficient methodology; rather, it is a statement of industry consensus, which is grounded on years of experience in maintaining retail spaces that are safe for workers and

14

visitors.[5]   In addition, we find no merit in Defendants' contention that Mr. Balian's testimony

regarding industry standards amounted to testimony that Defendants were negligent, as he never

expressed an opinion as to whether the box in this case intruded on a walkway, was "low profile,"

or otherwise violated the industry standards about which he testified.

We further note that, in order to establish their entitlement to a new trial based on trial court

error, Defendants must establish that the purported "error was so prejudicial that refusal to grant a

new trial would be inconsistent with substantial justice."   Carnegie Mellon Univ., 2013 WL

5332108, at *15 (quotation omitted).   Defendants have not established that any such prejudice

resulted from Mr. Balian's testimony.   This was not a complex case in which the jury had to place

great reliance on an expert's opinion.   The facts were simple and clear and, separate and apart

from Mr. Balian's testimony, the danger that Defendants created by using a box as a doorstop was

readily apparent.   We therefore reject any contention that substantial justice was compromised by

the admission of Mr. Balian's testimony.   For the above reasons, we deny Defendants' request for

a new trial insofar as it is grounded on alleged error in admitting Mr. Balian's testimony.

C.   Jury Charge

Defendants contend that they are entitled to a new trial because we erroneously gave a

"somewhat convoluted" charge regarding the duty that possessors of land owe to invitees.   (Defs.'

Mem at 11.)   The parties agreed, prior to trial, that we should use Pennsylvania Suggested

Standard Jury Instruction § 18.40, which provides as follows:

> An [owner][occupier] of land is required to use reasonable care in
> the maintenance and use of the land, and to protect invitees from
> foreseeable harm.   An [owner][occupier] of land is also required to

---

[5]   In fact, even the store manager, Mr. Dougherty, testified at trial that the presence of a box
in a walkway is a tripping hazard, which increases the likelihood of falls.   (N.T. 7/15/13 at 25-26.)

[inspect] the premises and to discover dangerous conditions.  An [owner][occupier] of land is liable for harm caused by invitees by a condition on the land if:

> 1.  the [owner][occupier] knows or by using reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm, and

> 2.  the [owner][occupier] should expect that the invitees will not discover or realize the danger or will fail to protect themselves against it, and

> 3.  the [owner][occupier] fails to use reasonable care to protect invitees against the danger.

An [owner][occupier] of land is subject to liability to invitees for any harm that the [owner][occupier] should have anticipated, regardless of whether the danger is known or obvious. (N.T. 7/17/13 at 23-24.)

(Jt. Proposed Pt. for Charge No. 19 (quoting Pa. Suggested Standard Jury Instructions (Civil) § 18.40).)    However, Defendants subsequently requested at trial that we give what they term a "prohibitive" charge, and instruct the jury that "'[a] possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them unless the possessor should anticipate the harm despite such knowledge or obviousness.'"   (Defs.' Proposed Point for Charge No. 3 (quoting Carrender, 469 A.2d 123).) In our instructions to the jury, we used the Pennsylvania Standard Jury Instruction, but modified the final paragraph to better reflect the requirements set forth in the three subparagraphs and instructed the jury as follows:

> A possessor of land is subject to liability to invitees for any harm that the possessor should have anticipated, regardless of whether the danger is known or obvious, provided that the possessor should have expected that invitees would fail to discover or realize the danger or would fail to protect themselves against the danger.

16

(N.T. 7/17/13 at 23-24.)

Where a movant seeks a new trial based on an alleged legal error in the jury instructions, we must consider "whether, taken as a whole, the instruction properly apprised the jury of the issues and the applicable law." Donlin v. Philips Lighting N. Am. Corp., 581 F.3d 73, 78 (3d Cir. 2009) (citation omitted). We have "'substantial discretion with respect to specific wording of jury instructions and need not give [a] proposed instruction if essential points are covered by those that are given.'" Grazier, 328 F.3d at 127 (alteration in original) (quoting Douglas v. Owens, 50 F.3d 1226, 1233 (3d Cir. 1995)). We abuse our discretion only "if the instruction was capable of confusing and thereby misleading the jury." Id. at 126 (quoting United States v. Fischbach & Moore, Inc., 750 F.2d 1183, 1195 (3d Cir. 1984)).

Here, Defendants do not contend that our instruction was an incorrect statement of the law. Rather, they only argue that the added language was "confusing with respect to whether a Plaintiff could recover if the jury found that the danger associated with her injury was known and obvious." (Defs.' Mem. at 11.) We conclude that the charge we gave was a clear and accurate statement of Pennsylvania law and properly instructed the jury as to the circumstances in which they could find Defendants liable even if the dangerous condition was known and obvious. We therefore deny Defendants' Motion insofar as it requests a new trial based on the assertion that we gave an improper jury charge.

D.    Remittitur

Defendants argue that they are entitled to remittitur because the jury verdict was "grossly excessive in light of the facts and evidence adduced at trial" and, thus, "shocks the conscience and sense of justice." (Defs.' Mem at 12-13.) Specifically, they assert that the jury's total damages

award of $834,703.33 included $650,000 in noneconomic damages,[6] and argue that this amount of noneconomic damages was unreasonable under the circumstances.

A remittitur "is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages." Cortez v. Trans Union LLC, 617 F.3d 688, 716 (3d Cir. 2010) (quoting Johansen v. Combustion Engineering, Inc., 170 F.3d 1320, 1331 (11th Cir. 1999)).   It is a "well established . . . device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." Cortez, 617 F.3d 688, 715-16 (3d Cir. 2010) (quoting Spence v. Bd. of Educ. of Christiana Sch. Dist., 806 F.2d 1198, 1201 (3d Cir. 1986)).   Whether to grant a remittitur is a matter within the trial court's sound discretion. Evans v. Port Auth. of New York and New Jersey, 273 F.3d 346, 354 (3d Cir. 2001) (citing Spence, 806 F.2d at 1200). Indeed, the trial judge "'is in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion.'" Id. (quoting Spence, 806 F.2d at 1201)).   In reviewing an allegedly excessive jury award, the district court should "'make a detailed appraisal of the evidence bearing on damages.'" Rivera v. Virgin Islands Hous. Auth., 854 F.2d 24, 27 (3d Cir. 1988) (quoting Grunenthal v. Long Island R.R. Co., 393 U.S. 156, 159 (1968).   The Court of Appeals will reverse a trial court order denying remittitur and will grant a new trial "'only if the verdict is so grossly excessive as to shock the judicial conscience.'" Id. at 27 (quoting Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 771 (3d Cir. 1987)).

While the jury's noneconomic damages award of $650,000 in this case is certainly generous, it is neither unreasonable nor irrational given the trial evidence regarding Ms. Ferguson's damages.   The evidence at trial established that, at the time of Ms. Ferguson's fall, she

---

[6] Ms. Ferguson's total medical expenses were $90,906.75, and her income loss was $93,769.58.   (N.T. 7/17/13 at 9.)   Thus, the remainder of the damages award reflected noneconomic damages.

was 68 years old.   (N.T. 7/16/13 at 47.)   She worked three days a week and wanted to continue to work as long as she could.   (Id. at 41, 48.)   According to her daughter, Ms. Ferguson "loved her job," and it "gave her a reason to get up and . . . do what she did every day."   (Id. at 84.)   Ms. Ferguson resided at the time of her fall, and resides now, with her boyfriend of close to 25 years, and he testified at trial that, prior to her accident, Ms. Ferguson not only drove, but also did "just about everything" around the house, including the cooking, cleaning and laundry.   (Id. at 33-34).

When Ms. Ferguson tripped over the box at Pathmark, she fractured both her right shoulder and her left knee, with her shoulder taking the brunt of her fall.   (Id. at 52-55, 72; Bonner Dep. Tr. at 15- 16.)   She testified that the pain in her shoulder was "so ungodly bad" that it was "worse than natural childbirth."   (N.T. 7/16/13, at 56.)   She was immediately hospitalized, and shortly thereafter had major surgery on her shoulder.   (Id. at 55-56.)   The shoulder fracture was a "complex," four-part fracture and, in surgery, the doctors took out a part of her bone and replaced it with a steel piece.   (Bonner Dep. Tr. at 16-17.)   Following surgery, Ms. Ferguson had "difficulties with ambulation and self-care activities" and spent at least three weeks in a rehabilitation facility.   (N.T. 7/16/13 at 56-57; Bonner Dep. Tr. at 18.)   Thereafter, in 2011 and 2012, Ms. Ferguson had 178 physical therapy appointments to address her shoulder injury.   (N.T. 7/16/13 at 6-7.)   Although the pain in her injured knee ended in July 2011, Plaintiff still has limited mobility in her right arm, and has pain in her right shoulder every day.   (Id. at 62-64, 71.) In essence, the accident "left [her] with serious restrictive range of motion and persistent severe pain," such that she cannot raise her right arm above shoulder height.   (Bonner Dep. Tr. at 21-22.)

Due to her limited shoulder mobility and related pain, Ms. Ferguson can no longer work or drive, no longer does laundry or cleans the house, and no longer lifts pots or pans with her right

arm.   (Id. at 23-24, 28, 50-51; N.T. 7/16/13 at 34-35, 57.)   She relies on either her boyfriend or

her sister to take her shopping.   (N.T. 7/16/13 at 36.)   Because she no longer drives herself, Ms.

Ferguson sees her daughter less frequently than she did before her fall.   (Id. at 81-82.)   She also

rarely makes it to her grandsons' sporting events, which she used to "always" attend.   (Id. at 81.)

According to Ms. Ferguson's daughter, she is "kind of recluse."   (Id.)   Ms. Ferguson testified

that she no longer has her independence and is "at the mercy of everyone else."   (Id. at 64-65.)

She still takes a nighttime sleeping aid to help her to sleep on some nights, and still takes Percocet

for the continuing pain in her shoulder.   (N.T. 7/16/13 at 36, 43; Bonner Dep. Tr. at 15.)   Ms.

Ferguson's medical expert testified that her injury is permanent and her prognosis is poor.

(Bonner Dep. Tr. at 23, 27-28.)   In his view, her condition will likely deteriorate as she gets older

and she will have to continue with home therapy in order to lessen that deterioration.   (Id. at 28.)

At Plaintiff's request, we instructed the jury regarding Ms. Ferguson's life expectancy in

connection with the calculation of damages.   Specifically, we instructed the jury that, according to

statistics compiled by the United States Department of Health and Human Services, Ms. Ferguson

had a life expectancy of 16.6 years.   (N.T. 7/17/13 at 28).   Given this life expectancy and the

evidence regarding the impact of Ms. Ferguson's injuries on her life, we do not find the jury's

damages award to be unreasonable or irrational.   It certainly does not "shock the judicial

conscience."   Rivera, 854 F.2d at 27.   We therefore deny Defendants' Motion insofar as it seeks

remittitur.

**IV.    CONCLUSION**

For the reasons set forth above, we deny Defendants' Motion in its entirety.    An appropriate order follows.


                                        BY THE COURT:

                                        /s/ John R. Padova, J.

                                        _____

                                        John R. Padova, J.